[No. 27249. *En Banc.* January 28, 1939.]

BERTHA DOANE FOSTER, *Appellant,* v. W. R. BRADY, *Respondent.*[1]

*Graham K. Betts,* for appellant.

*Edgar S. Hadley* and *Eugene F. Hooper,* for respondent.

BEALS, J.—February 15, 1937, George W. Doane died, at the age of eighty-three, leaving a will by which he devised his entire estate, with the exception of one hundred dollars, to W. R. Brady, his physician, a stranger to the blood, and naming Dr. Brady sole executor without bond. The will having been admitted to probate, Bertha Doane Foster, a half-sister of the testator, who was bequeathed one hundred dollars by his will, filed her petition in contest of the will, on the

[1]Reported in 86 P. (2d) 760.

grounds of mental incapacity and undue influence. From a decree dismissing her petition, she appeals.

Mr. Doane was a bachelor, and had no near blood relatives, save appellant and her children. For several years prior to his death, he had resided either in the city of Seattle or at Harper, in Kitsap county, just across Puget sound. Before moving to Harper, he had lived near Alki Point, in that portion of the city known as West Seattle, where he had become acquainted with respondent, who was a physician, and who had conducted a small hospital or sanitarium. For ten years or so prior to his death, Mr. Doane suffered from a chronic heart ailment, and from time to time consulted Dr. Brady. On at least two occasions, Mr. Doane spent several days as a patient in respondent's hospital.

Early in February, 1937, Mr. Doane became very ill, and a neighbor brought him from his home at Harper to Dr. Brady. This neighbor testified that he took Mr. Doane to Dr. Brady's February 8th, while Dr. Brady testified that Mr. Doane came to him February 4th. Mr. Doane was so sick that Dr. Brady suggested that he go to the Swedish hospital, but Mr. Doane preferred to remain with Dr. Brady, who testified that, while he was not at that time operating a sanitarium, he did conduct an emergency hospital. Mr. Doane was treated by Dr. Brady, and was nursed by Mrs. Brady and another lady, until his death.

Respondent testified that, when Mr. Doane came to his home, he was suffering from a serious heart condition, indicated by cyanosis of the lips and ears, and had a temperature of 101 degrees. Respondent also testified that the sick man was suffering from bronchial pneumonia, "like a flu or grippe." Evidence introduced by appellant indicates that the pneumonia was probably of lobar type, rather than bronchial. The next day, Mr. Doane's temperature was down a degree, and

on the 6th it was about normal, and on the three following days was subnormal.

February 9th, Mr. Doane felt better and wanted to go to a barber shop. Respondent testified that, although he protested against this, he complied with Mr. Doane's wish, taking him in a closed car. Not unnaturally, the next morning Mr. Doane again manifested symptoms of bronchial pneumonia. Concerning his condition, respondent testified:

"Q. And it [his temperature] continued to go up, reaching 101 on the 12th? A. Yes. I believe that's about the way my memory is. Q. And on the 13th, 101.6. In fact, it was never below 100 after you took him out, was it? A. Well, he had a temperature that next morning, a little, 99. I know that was true. Sort of a relapse, the way I figured what it must be. Q. You ordinarily take patients out of the hospital, out in the open air, five days after they are admitted, with pneumonia? A. No, I don't; but this is not an ordinary case. I don't know how I could have worked it. If you will let me explain it, I will explain."

Another physician was called in consultation on the 12th, and again on the 14th. Mrs. Brady had been nursing Mr. Doane, and on the 14th, a Mrs. Hays was called in to assist in caring for him. The consulting physician who visited Mr. Doane on the 14th testified that, at that time, the sick man was in possession of his mental faculties.

Mr. Doane died Monday, February 15th, leaving an estate consisting of a tract of real estate at Harper, three lots near Alki Point, some personal property, and $4,811.21 on deposit with Washington Mutual Savings Bank, the total appraised value of the estate being almost ten thousand dollars.

Appellant, Bertha Doane Foster, Mr. Doane's sister, had always been on friendly terms with him, he having always spoken of her affectionately and remem-

bered her with gifts of money each Christmas. The brother and sister had regularly corresponded, he writing to her two or three times a year, and she to him probably twice as frequently.

Some years prior to 1937, Mr. Doane had made a will, in which he bequeathed his sister one thousand dollars, leaving the balance of his estate to a Mrs. Ellis, a friend who had been kind to him. It appears that, prior to his last sickness, Mr. Doane had destroyed this will.

Respondent testified that, while sick at his home, Mr. Doane stated that he wished to consult an attorney, whereupon, on the evening of February 13th, respondent called in his attorney, Edgar S. Hadley, who wrote in longhand a will for Mr. Doane. A Mr. Bloch, a tenant of Dr. Brady's, was called in, and Mr. Doane then signed the will, which was witnessed by Messrs. Bloch and Hadley. Whether respondent and his wife were present at the time the will was signed, is not clear, but they were in the house, and were in and out of the room while Mr. Hadley was drafting the instrument. The witnesses both testified that Mr. Hadley read the will to Mr. Doane, and that the latter, before executing it, sat up in bed and himself read the document. These witnesses, of course, vouched for Mr. Doane's testamentary capacity at that time. By this will, Mr. Doane left one hundred dollars to his sister, leaving all the remainder of his property to respondent, Dr. W. R. Brady.

Some difficulty was experienced in establishing contact with Mr. Doane's sister, and the funeral was not held until the Saturday after Mr. Doane's death. In the meantime, Dr. and Mrs. Brady went to Mr. Doane's home at Harper and examined his effects. February 18th, the will was filed and admitted to probate on

respondent's petition, letters testamentary were issued to respondent, and the following day respondent withdrew the money from the savings bank and put it in a safe deposit box. After some investigation of the circumstances, appellant, during the month of August, 1937, filed her petition in contest of the will, which, after a lengthy hearing, was dismissed.

Appellant assigns error upon the denial of her motion for a jury trial; upon the court's finding that, at the time of making the will, Mr. Doane was possessed of testamentary capacity, and that the will was not the result of undue influence exercised upon the testator by respondent. Error is also assigned upon the dismissal of the petition; and upon the denial of appellant's motion for a new trial.

At the time of filing her petition, appellant caused a citation to issue, directed to respondent, both as executor and individually, requiring him to answer her petition. This citation was served upon respondent by a qualified private individual, and not by the sheriff or his deputy. Respondent appeared specially, and moved to quash the service of this citation, upon the ground that the same was served by a private individual. Respondent at all times maintained his special appearance and questions the jurisdiction of this court to entertain the appeal, arguing that the superior court never obtained jurisdiction over respondent, for the reasons assigned.

A somewhat similar question was presented to this court *In re Laack's Estate*, 188 Wash. 462, 62 P. (2d) 1087, in which, citing *Donaldson v. Winningham*, 62 Wash. 212, 113 Pac. 285, we held that a notice calling up for hearing a petition in a probate proceeding could properly be served by a qualified private citizen. Under authority of this case, the citation to respondent

was propery served, and the trial court did not err in denying respondent's motion to quash the service.

Respondent's wife filed a claim against the estate for one hundred dollars "for three weeks service as a nurse during the last sickness," although, of course, she knew when she verified the claim that she had served as Mr. Doane's nurse for a period much shorter than three weeks.

Sylvia Hays also filed a claim for sixty dollars for two weeks services as nurse, although she served only two days. This claimant, however, was paid only six dollars for her services, instead of the sixty dollars which she demanded. The claim which Mrs. Hays filed for services as nurse was by her signed in blank, at the instance of Mrs. Brady, and was afterwards filled in, without Mrs. Hays' knowledge, as for sixty dollars for two weeks services.

The record discloses nothing which indicates that there was any strong personal friendship between Mr. Doane and the respondent. Apparently, the relationship was merely that of occasional physician and patient. While it is to be expected that a patient entertains a regard for his physician, the very relationship itself imposes upon the physician the duty to exercise the highest degree of good faith in dealing with his patient, not only in professional matters, but in all other relationships, and particularly such a transaction as this.

While Mr. Doane was under respondent's care, the usual nurse's records or bedside charts were kept. These charts were introduced in evidence, and in its oral decision, the trial court observed that

". . . the evidence introduced on behalf of the petitioner establishes a number of very suspicious circumstances, namely, circumstantially showing that the

bedside charts showing the condition of the decedent were tampered with."

This observation is amply supported by the record.

While appellant was advised that her brother had left some real estate, she was not informed that he had also left $4,800 in cash.

While this court has repeatedly approved the doctrine that opportunity to exert undue influence is not sufficient to support a finding of undue influence, even though the circumstances under which a will was executed might arouse suspicion (*In re Bradley's Estate*, 187 Wash. 221, 59 P. (2d) 1129), it has recognized the fact that ordinarily undue influence can be established only by circumstantial evidence. *In re Tresidder's Estate*, 70 Wash. 15, 125 Pac. 1034. This court has also recognized that the circumstances surrounding the execution of a will may be so suspicious and suggestive as to raise a presumption of undue influence, which may be overcome only by clear and satisfactory evidence that no such influence was exerted. *In re Beck's Estate*, 79 Wash. 331, 140 Pac. 340. In the recent case of *Dean v. Jordan*, 194 Wash 661, 79 P. (2d) 331, considering this question, we said:

"Nevertheless certain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength, against the validity of the testamentary instrument. The most important of such facts are (1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an

undue influence, and the naturalness or unnaturalness of the will."

In the case at bar, we find all the elements suggested in the foregoing quotation—the testator of great age and very ill, suffering from a mortal disease; the beneficiary occupying the relation not only of physician but of custodian, and actively participating in the procurement of the will, receiving thereunder an unnaturally large proportion of the estate, to the practical exclusion of the testator's nearest living blood relative, for whom he had always manifested affection, and whom he had remembered much more substantially in a prior will. In addition, the conduct of respondent excites suspicion, in that the two claims above referred to were padded, certainly to respondent's knowledge; respondent immediately took possession of the money and placed it, not openly in a bank, but in a safe deposit box, later redepositing it in the savings bank; and the record charts were tampered with. 'In its oral decision, the trial court, after referring to some of the evidence above referred to, stated:

"Those disquieting circumstances are sufficient to lead the court to scrutinize the testimony very rigidly; and, for the purpose of determining where the weight of the testimony lies, to attach little credence to the testimony of Dr. Brady."

The determination of this case need not rest upon the legal presumption above referred to. Rather, the case falls within the rule applied *In re Tresidder's Estate, supra.* The evidence sufficiently establishes the fact of undue influence. In any event, in the face of undisputed facts and circumstances, the extremely unsatisfactory testimony of respondent and his wife is wholly insufficient to overcome the presumption. Con-

sidered in its entirety, the evidence preponderates against the conclusion reached by the trial court.

The decree dismissing appellant's petition is reversed, with instructions to sustain appellant's contest to the will.

BLAKE, C. J., STEINERT, MAIN, MILLARD, GERAGHTY, ROBINSON, and SIMPSON, JJ., concur.